IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

## STATE OF TENNESSEE v. KARLOSS THIRKILL

**Appeal from the Criminal Court for Shelby County**
**No. 10-06371     Glenn Wright, Judge**

_____

**No. W2015-00456-CCA-R3-CD  -  Filed March 29, 2016**

_____

Following a jury trial, the Defendant, Karloss Thirkill, was convicted of aggravated robbery, a Class B felony.  See Tenn. Code Ann. § 39-13-402.  The trial court subsequently imposed a ten-year sentence for the conviction.  On appeal, the Defendant contends (1) that the trial court erred in admitting a video recording of the crime when the witness "did not have personal knowledge [of the contents of the video] nor was involved in the chain of custody"; and (2) that the evidence was insufficient to sustain his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Eric Mogy, Memphis, Tennessee (at trial and on appeal); and Bradley J. Eiseman, Memphis, Tennessee (at trial), for the appellant, Karloss Thirkill.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On July 9, 2010, Bennie Jackson worked as a clerk at a BP gas station in Memphis, Tennessee.  Mr. Jackson testified at trial that he was working the cash register that night when a man he did not know entered the gas station and "purchased [some] cigars and . . . walked back out."  A short time later, the man returned and told Mr.

Jackson that he had gotten "the wrong flavor and wanted to exchange" the cigars.  Mr. Jackson recalled that the man was "bending over like . . . he was trying to get something out of his pocket" when he "got some gum" and placed it on the counter.

Mr. Jackson testified that the man "continued to . . . lean forward like he was still trying to dig something out of his pocket."  The man then pulled out a gun and pointed it at Mr. Jackson.  The man told Mr. Jackson "to leave the [cash] drawer open and back up."  Mr. Jackson testified that the man reached over the counter, "took all the cash out of the drawer," and "raised it up to see if there was any" cash underneath the drawer.  The man also "reached over the counter [and tried] to feel for something else."  Mr. Jackson testified that the man then walked around the counter and took "a stack of ones" from behind the counter.

Mr. Jackson testified that he "complied with what [the man] requested" because the man "had a weapon" and that he "didn't want to get shot over somebody else's money."  The man walked back around the counter after taking the "stack of ones" and took another cigar from the counter as he left the gas station.  Mr. Jackson then had Darryl Williams, a "stock worker" who was also working at the BP that night, lock the door.  Mr. Jackson "pressed the panic button and . . . took out [his] cell phone and called the police."  Mr. Jackson could not remember how much money was taken but testified that "the owner calculated it at" $300.

Mr. Williams also testified at trial.  Mr. Williams recalled that he was stocking candy onto a shelf when he saw a man with a gun go "around the counter" and "[grab] a handful of the money there."  While the man was behind the counter, a customer walked into the gas station, and the man told the customer to leave if he did not "want to get hurt."  Mr. Williams testified that he could not identify the robber because he "didn't want to look at the man eye to eye" and, therefore, did not get a good look at the man's face.

Officer Brandon Hudson of the Memphis Police Department (MPD) testified that he responded to a report of a robbery at the BP gas station on July 9, 2010.  Officer Hudson recalled that he spoke to the victim and then waited forty-five minutes to an hour for the owner of the gas station to arrive.  The owner "was able to show" Officer Hudson the video footage from the gas station's security cameras.  Officer Hudson recalled that he watched the video footage that day with Mr. Jackson and the gas station's owner.

Sergeant James Taylor of the MPD testified that he was the "case officer" regarding this offense.  On July 21, 2010, Sgt. Taylor spoke with Mr. Jackson at the BP gas station.  Sgt. Taylor recalled that Mr. Jackson was working when they spoke but that he showed Mr. Jackson a photographic lineup.  Sgt. Taylor testified that before showing Mr. Jackson the lineup, he read to Mr. Jackson an "advice to witness" form.  Sgt. Taylor

further testified that he allowed Mr. Jackson to review the form and that he believed that Mr. Jackson read the form. After reviewing the "advice to witness" form, Mr. Jackson selected the Defendant's picture from the photographic lineup. Sgt. Taylor testified that Mr. Jackson was "sure" that the picture he selected showed the man who robbed the gas station on July 9, 2010.

Mr. Jackson recalled speaking to Sgt. Taylor and picking the Defendant's picture out of the lineup. Mr. Jackson initially testified that he had read the "advice to witness" form in addition to Sgt. Taylor's reading and explaining it to him. Mr. Jackson testified that he was "sure" when he selected the Defendant's picture that the Defendant was the robber. On cross-examination, Mr. Jackson admitted that he had only glanced over the "advice to witness" form, but he felt that was good enough because Sgt. Taylor "took the time to explain it" to him. Mr. Jackson reiterated during cross-examination that he was positive when he made his selection from the photographic lineup.

Sgt. Taylor testified that he obtained a copy of the gas station's security camera footage. Sgt. Taylor recalled that he did not obtain the video himself but that he sent a technician to the get a copy of the footage because the gas station owner "said that his CD burner was broken." The video was introduced at trial during Officer Hudson's testimony. Officer Hudson testified that the video played for the jury was the same as the one he watched with the owner and Mr. Jackson on the day of the robbery. Mr. Jackson also testified that the owner showed him the security camera footage on July 9, 2010. Mr. Jackson testified that the robbery as he had described it at trial was "captured on [the] surveillance video" and that the video played for the jury was the same as the video he watched with the gas station owner.

At trial, Mr. Jackson identified the Defendant as the robber. Mr. Jackson testified that he got a good look at the robber because the man was "standing right there in front of" him during the robbery and that he "didn't take [his] eyes off of" the man during the robbery. Mr. Jackson also denied being scared during the robbery, explaining that "it wasn't the first" time that he had been robbed.

Mr. Jackson admitted that during an October 2011 hearing, he was unable to identify the Defendant. Mr. Jackson explained that there were several people "sitting by" the Defendant when he was asked to make an identification and that he "didn't want to . . . point at the wrong person." Mr. Jackson testified that he was positive that the Defendant was the robber and that he felt comfortable identifying him at trial because his memory had been "refreshed" after recently reviewing the video footage and the photographic lineup.

Mr. Jackson admitted on cross-examination that he said during the October 2011 hearing that he only "somewhat" remembered what the robber looked like because he had

"viewed a surveillance tape" the morning after the robbery. Mr. Jackson further admitted that during the October 2011 hearing, he said that he did not get "a good look [at the robber] that stuck in [his] mind" and that the video was not "close enough to make an" identification.

Based upon the foregoing evidence, the jury convicted the Defendant of aggravated robbery. The trial court subsequently imposed a ten-year sentence for the conviction. This timely appeal followed.

## ANALYSIS

### I. Authentication of Security Camera Footage

The Defendant contends that the trial court erred in admitting a video recording of the crime taken from a security camera when Officer Hudson "did not have personal knowledge [of the contents of the video] nor was involved in the chain of custody." The Defendant argues that Officer Hudson was not present during the robbery and, therefore, "he could not state what happened during the robbery." The Defendant further argues that the chain of custody was not established because Officer Hudson "did not view the video until more than [forty-five] minutes had passed" and suggests that the footage could have been tampered with during that time. The State responds that the trial court did not err in admitting the video during Officer Hudson's testimony. The State further responds that any possible error was ultimately harmless because Mr. Jackson testified that the video fairly and accurately depicted the robbery.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." One example of authentication provided by Rule 901 is testimony from a witness with knowledge "that a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). As such, testimony from a witness that a video recording of a crime fairly and accurately portrays the offense as it occurred is sufficient to authenticate the video. State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996); State v. Bruce C. Reliford, No. W2007-02899-CCA-R3-CD, 2010 WL 1610517, at *4 (Tenn. Crim. App. Apr. 19, 2010).

Here, any error in admitting the video during Officer Hudson's testimony was ultimately harmless given Mr. Jackson's testimony that it fairly and accurately portrayed the robbery. See State v. Osayamien Ogbeiwi, No. W2010-00117-CCA-R3-CD, 2011 WL 3276188, at *12 (Tenn. Crim. App. July 29, 2011) (concluding that the trial court did not make "a clear mistake" when it admitted security camera footage because it was introduced during the testimony of the police officer who reviewed and retrieved the

footage shortly after the offense, the video "supplemented the testimonies" of witnesses, and the defendant admitted to being "the gunman seen on the video shooting the victim").

With respect to the Defendant's argument that the chain of custody was not established, the record belies his argument that the footage could have been tampered with because Officer Hudson waited over forty-five minutes to view the footage. Officer Hudson was delayed in viewing the footage because the gas station owner was needed to access the security camera system. Officer Hudson testified that once the owner arrived, he viewed the footage with the owner and Mr. Jackson. Still, the technician Sgt. Taylor sent to retrieve the footage did not testify at trial; therefore, the chain of custody was not technically complete. However, "[a]ny failure in the chain of custody was . . . remedied by" Mr. Jackson's testimony, which "confirmed that the [video] fairly and accurately depicted the robbery." State v. Robert S. Clark, No. W2001-00921-CCA-R3-CD, 2002 WL 1841721, at *5 (Tenn. Crim. App. Aug. 5, 2002).

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction. The Defendant argues that the State failed to establish his identity as the perpetrator. Specifically, the Defendant focuses on the "unreliability" of Mr. Jackson's identification. The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out

every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). "The credibility of the witnesses and the accuracy of their identification are matters entrusted to the jury." State v. Jimmy Barnes, No. 72, 1988 WL 82969, at *1 (Tenn. Crim. App. Aug. 10, 1988). Mr. Jackson was intensely cross-examined about his inability to identify the Defendant at the October 2011 hearing. However, the jury chose to accredit his identification of the Defendant at trial, and we will not disturb that determination on appeal. Furthermore, the jury was able to view the security camera footage, which showed the Defendant looking directly into the camera on several occasions. Accordingly, we conclude that the evidence was sufficient to establish the Defendant's identity as the perpetrator of the offense and to sustain his conviction.

## CONCLUSION

Upon consideration of the following and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-6-